UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MONIQUA W.[1],                          Case No. 1:20-cv-767
     Plaintiff,                         Litkovitz, M.J.

     vs.

COMMISSIONER OF                         **ORDER**
OF SOCIAL SECURITY,
     Defendant.

Plaintiff Moniqua W. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court for disposition based on plaintiff's Statement of Errors (Doc. 16), the Commissioner's response (Doc. 19), and plaintiff's reply (Doc. 21).

**I. Procedural Background**

Plaintiff protectively filed her applications for DIB and SSI in October 2017, alleging disability since December 15, 2015,[2] due to congestive heart failure, asthma, high blood pressure, hearing loss, lower back injury and left side nerve loss stemming from a July 2017 car accident, and left ventricular dysfunction. (Tr. 101, 113). The applications were denied initially and upon reconsideration. Plaintiff requested and was granted a *de novo* hearing before administrative law judge (ALJ) Carrie Kerber. Plaintiff and a vocational expert (VE) appeared

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

[2] At the administrative hearing, plaintiff asked to amend her alleged onset date to May 30, 2016. (Tr. 37). The ALJ's decision is based on December 15, 2015. (Tr. 16).

and testified at the ALJ hearing on October 17, 2019.  On December 12, 2019, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  This decision became the final decision of the Commissioner when the Appeals Council denied review on September 8, 2020.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.

2. [Plaintiff] has not engaged in substantial gainful activity since December 15, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: chronic combined systolic and diastolic heart failure, hypertension, hyperlipidemia, chronic obstructive pulmonary disease (COPD), degenerative disc disease of the lumbar spine, post-laminectomy syndrome, and lumbosacral spondylosis, status-post arthroscopic surgery of the left knee in June 2018 (20 CFR 404.1520(c) and 416.920(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional climbing ramps/stairs; no climbing ladders, ropes or scaffolds; frequent balancing and kneeling; occasional stooping, crouching and crawling; only occasional exposure to extreme cold/heat, wetness, humidity, vibration, fumes, odors, dusts, and gases; avoid all exposure to hazards such as dangerous machinery and unprotected heights; and no commercial driving.

6. [Plaintiff] is capable of performing past relevant work as a Security guard 372.622-034, SVP 3 light. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from December 15, 2015, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18-23).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Medical Evidence

#### 1. Emergency department treatment

In May 2016, plaintiff presented to the emergency department of Good Samaritan Hospital with syncope and chest pain. (Tr. 1436-37, 1441).[3] Plaintiff was admitted and underwent a CT angiogram and cardiac MRI, which were normal, and there was no evidence of pericarditis, pericardial effusion, asthma exacerbation, shortness of breath, or dysrhythmia. (Tr. 491, 1441, 1444). Pulmonary spirometry testing performed during her admission was "suggestive of restrictive defect." (Tr. 632, 636). Plaintiff's physical examination was normal. (Tr. 1439).

In July 2016, plaintiff again presented to the emergency department with chest pain. (Tr. 360). Plaintiff's physical examination and EKG were normal. (Tr. 361, 363). Given the recent, extensive testing done during plaintiff's prior admission, the emergency department physician did not think further testing or admission was warranted. (Tr. 365). He diagnosed "[n]on-

---

[3] Plaintiff's admission date corresponds to the onset date requested at the administrative hearing.

cardiac chest pain." (*Id.*). A subsequent brain MRI concerning plaintiff's symptoms was negative. (Tr. 475).

In October 2016, plaintiff again presented to the emergency department with chest pain, dizziness, and syncope. (Tr. 459, 461, 463, 468 (clinical testing records reflecting "ED to Hosp-Admission")). Testing performed during her admission revealed less than 50% stenosis, no evidence of deep vein thrombosis in the bilateral lower extremities, a normal head CT scan, and a normal chest x-ray. (Tr. 460, 464, 468, 471).

In January 2017, plaintiff returned to the emergency department, this time presenting with high blood pressure and a sharp headache. (Tr. 343-44). Plaintiff denied shortness of breath, chest pain, and edema. (Tr. 344). Plaintiff's physical examination was normal. (Tr. 346). The emergency department physician diagnosed a temporal headache and felt that no further testing or admission was warranted. (Tr. 347).

In September 2018, plaintiff returned to the emergency department, this time presenting with shortness of breath and dysuria. (Tr. 2969). Plaintiff's physical examination reflected wheezing, but she denied experiencing chest pain. (Tr. 2972). The emergency department physician diagnosed a COPD exacerbation and urinary tract infection. (Tr. 2974). In October 2018, plaintiff presented to the emergency department of Bethesda North with chest pain, arm pain, and lightheadedness. (Tr. 2789). Plaintiff denied shortness of breath and palpitations. (Tr. 2792-93). Plaintiff's EKG and physical examination were normal except for chest tenderness. (Tr. 2793). The emergency department physician diagnosed atypical chest pain. (Tr. 2796).

## 2. Cardiology treatment

In January 2017, after her syncopal episodes, plaintiff treated with cardiologist John H. Wilson, M.D.  (Tr. 644).  Dr. Wilson noted that plaintiff experienced no syncope since the implant of a loop recorder in October 2016.  (*Id.*).  Plaintiff denied malaise/fatigue, shortness of breath, wheezing, chest pain, palpitations, leg swelling, back pain, or depression, and her physical examination was normal  (Tr. 644, 646).  Dr. Wilson assessed left ventricular hypertrophy and unspecified syncope.  (Tr. 646).  In November 2017, plaintiff denied experiencing malaise/fatigue, shortness of breath, wheezing, chest pain, palpitations, leg swelling, back pain, dizziness, or weakness.  (Tr. 648).  Dr. Wilson recorded a normal physical examination.  (Tr. 651).  Dr. Wilson assessed unspecified syncope, essential hypertension, atypical chest pain, left ventricular hypertrophy, and chronic combined systolic and diastolic heart failure "NYHA class 1."[4]  (*Id.*).  In April 2018, plaintiff reported malaise/fatigue, chest pain, joint pain, shortness of breath, and dizziness.  (Tr. 1003).  Plaintiff's physical examination, stress test, and echocardiogram were normal.  (Tr. 1006, 1010, 1012-13).

In September 2018, plaintiff treated at the Cleveland Clinic with Jerry Estep, M.D.  (Tr. 1245).  In assessing plaintiff's heart failure, Dr. Estep described it as "NYHA Functional Class: II" and "Stage: C."[5]  (Tr. 1251).  Plaintiff reported symptoms of sleep difficulty, shortness of breath, and chronic back pain; but she denied symptoms of weakness, headache, wheezing,

---

[4] This refers to the New York Heart Association (NYHA) classification system, which divides heart failure into four categories.  *See* https://www.mayoclinic.org/diseases-conditions/heart-failure/diagnosis-treatment/drc-20373148 (last visited March 7, 2022).  Class "1" or "I" indicates heart failure without symptoms.  *Id.*
[5] Stage C refers to a classification system from the American College of Cardiology/American Heart Association, and describes a patient with "heart disease and signs and symptoms of heart failure."  *See* https://www.mayoclinic.org/diseases-conditions/heart-failure/diagnosis-treatment/drc-20373148 (last visited March 7, 2022).  Class II under the NYHA classification system indicates that "[e]veryday activities can be done without difficulty but exertion causes shortness of breath or fatigue."  (*Id.*).

depression, or anxiety.  (Tr. 1250-51).  Dr. Estep did not record any abnormalities on physical

examination.  (Tr. 1251).  Dr. Estep's notes include a summary of plaintiff's cardiac testing

between September 2016 and August 2018, which reflects mostly normal findings with some

mild-moderate abnormalities.  (Tr. 1246-49).

### 3. Low back treatment

Plaintiff began physical therapy for low back pain in June 2017.  (Tr. 2515).  Intake

records reflect that plaintiff began experiencing pain in 2015 that worsened in 2017.  (Tr. 2517;

*see also* Tr. 773 (May 2017 report of low back pain to primary care physician)).  Shortly

thereafter, on July 6, 2017, plaintiff was in a car accident that aggravated her low back pain.  (Tr.

2533).  Plaintiff presented to the emergency department three days after the accident with sharp,

severe back pain.  (*Id.*).  Plaintiff exhibited lumbar tenderness on examination.  (Tr. 2536).  A

lumbar spine MRI performed shortly thereafter showed severe degenerative spondylosis L5-S1

and a degenerative spur and left paracentral protrusion L5-S1 with the potential to irritate the left

S1 nerve root origin.  (Tr. 431).  Plaintiff reported that physical therapy had been helpful prior to

the car accident (Tr. 769) and continued with it thereafter (Tr. 762).

Plaintiff underwent lumbar surgery related to the L5-S1 region in November 2017.  (Tr.

707).  Just after surgery, plaintiff reported continuing pain, exhibited tenderness, and received a

handicapped placard.  (Tr. 752-53, 755-56).  By January 2018, plaintiff rated her low back pain

at 4/10, though she exhibited tenderness to lumbar palpation, diminished range of back motion,

and positive facet loading bilaterally.  (Tr. 809, 811).  By April 2018, plaintiff reported her low

back pain at 2/10 with similar findings on examination as in January 2018.  (Tr. 1024, 1026-27).

Plaintiff began pain management in August 2018. (Tr. 1275). Though pain and range of motion issues perisisted, plaintiff's pain ratings on the days of her visits and on average decreased over time from 6/10 to 4/10 and from 8/10 to 6/10, respectively. (Tr. 1276, 1279-80, 1311-12, 1315, 1343, 3314-16, 3353, 3357-58). Plaintiff's gait remained normal throughout pain management. (*See id.*).

### 4. Incontinence treatment

In December 2017, plaintiff reported urinary incontinence to her primary care physician that had persisted for over one year. (Tr. 749). Primary care treatment notes through the year prior did not previously document this impairment. (*See, e.g.*, Tr. 752-56 (November 2017 visit); Tr. 773-76 (May 2017 visit); Tr. 877-83 (March and April 2017 visits); Tr. 888-92 (January 2017 visit); Tr. 897-901 (November 2016 visit)). Plaintiff also denied changes in her bladder at a November 2016 neurology visit. (Tr. 893).

In March 2018, plaintiff treated with Cincinnati Urogynecology Associates on referral from her primary care physician. (Tr. 3412). Catrina C. Crisp, M.D., assessed stress urinary incontinence, microscopic hematuria, urinary urgency, and urinary frequency. (Tr. 3415). The record reflects one follow-up appointment in April 2018 but not the annual follow-up recommended. (Tr. 3492, 3496). After this specialized treatment, plaintiff sometimes reported incontinence and other times not. (*See, e.g.*, Tr. 1275 (incontinence noted during an August 2018 low back pain management consultation); Tr. 1019-23, Tr. 2875-79 (incontinence symptoms not noted at May 2018 visit for an upper respiratory infection or a May 2019 visit

related to hypertension); and Tr. 1211 ("no current sig[nificant] urinary [symptoms]" noted at a June 2018 physical)).

5. Mental health treatment

Plaintiff did not begin specialized mental health treatment until November 2018. (Tr. 3377). Prior to that, plaintiff did not report mental health symptoms or exhibit related abnormalities (*see, e.g.*, Tr. 752-56, 772-76, 805-09, 918-19, 1206-09 (July 2016, May and November 2017, and June 2018 visits primary care visits), or she reported no more than mild symptoms (*see, e.g.,* Tr. 805 (February 2018 primary care visit note: "[n]o sig[nificant] mood problems[,] [o]ccasional anxiety[,] [n]o depressed mood[,]" and "[n]o SI/HI[,]") and Tr. 899-900 (November 2016 primary care visit notes including plaintiff's report of depression, malaise, and insomnia and reflecting possible "situational depression")). In May 2019, plaintiff reported some breakthrough mood symptoms to her primary care physician, but she also reported that her mood was stable, Cymbalta was "working well," and she was not experiencing side effects or suicidal ideation. (Tr. 2875).

6. Primary care

In July 2016, plaintiff established care with Michael A. Hoffmann, M.D. (Tr. 916). Plaintiff reported intermittent wheezing and chest pains, even at rest. (Tr. 918). Plaintiff demonstrated mild tenderness along her sternal border on examination. (Tr. 919). Dr. Hoffmann diagnosed moderate, controlled asthma and atypical chest pain. (*Id.*). In September 2016, Dr. Hoffmann noted that plaintiff's angiogram did not show significant abnormalities. (Tr. 912, 915). Plaintiff denied chest pain, palpitations, and leg swelling, but she did report dizziness and

loss of consciousness.  (Tr. 914).  On physical examination, plaintiff exhibited no abnormalities.
(Tr. 914-15).  In November 2016, plaintiff reported malaise/fatigue, dizziness, headaches, and
insomnia (Tr. 899), but her physical examination was normal.  (Tr. 900).  Dr. Hoffmann noted
plaintiff's reported insomnia as "secondary to situational depression" and recommended
counseling.  (*Id.*).

In January 2017, plaintiff reported no chest pain or syncope, but she reported intermittent
malaise/fatigue and dizziness.  (Tr. 890).  Plaintiff's physical examination was normal.  (Tr. 890-
92).  Dr. Hoffmann noted plaintiff's "controlled" hypertension and asthma but referred her to a
psychologist.  (Tr. 888, 891).  In March 2017, plaintiff reported continuing problems with
dizziness, difficulty breathing, and intermittent chest pain.  (Tr. 880).  Plaintiff denied depression
and indicated that she would not follow-up regarding the psychology referral.  (Tr. 880, 882).
Her physical examination was normal.  (Tr. 882).

In May 2017, plaintiff established care with Kai Huang, M.D.  (Tr. 872).[6]  Plaintiff
reported dizziness and intermittent low back pain, but she did not report asthma exacerbations,
chest tightness, chest pain, heart palpitations, shortness of breath, or wheezing.  (*Id.*).  Plaintiff
exhibited no abnormalities on examination.  (Tr. 875).  Dr. Huang diagnosed hypertension, left
ventricular hypertrophy, mild diastolic dysfunction, unspecified syncope, moderate persistent
asthma without complication, and chronic bilateral low back pain with left-sided sciatica.  (Tr.
875).  Dr. Huang noted that the low back pain was "stable" and recommended conservative
treatment to include physical therapy.  (*Id.*).  In December 2017, plaintiff primarily complained

---

[6] Dr. Hoffmann's notes indicate that he was transitioning his practice.  (Tr. 883).

of urinary issues. (Tr. 749). Plaintiff did not exhibit any abnormalities on examination. (Tr. 751).

In April 2018, plaintiff complained of recent chest pain, bilateral lower extremity swelling, occasional left arm pain. (Tr. 1161). Plaintiff exhibited non-tender musculoskeletal edema on examination. (Tr. 1164). Dr. Huang assessed unspecified chest pain (noting stable cardiologic and pulmonary symptoms), dyspnea on exertion, controlled hypertension, bilateral lower extremity edema, and elevated d-dimer. (Tr. 1164). Securing clearance for her arthroscopic knee surgery in May 2018 (Tr. 1190), plaintiff reported no malaise/fatigue, shortness of breath or wheezing, chest pain, palpitations, leg swelling, or dizziness. (Tr. 1192-93). Plaintiff's physical examination and EKG were normal. (Tr. 1193). Dr. Huang noted "no recent history of new cardio/pulm symptoms" and diagnoses of "controlled" hypertension and "well controlled" mild intermittent asthma without complication. (Tr. 1193-94).

In June 2018, plaintiff did not report malaise/fatigue, shortness of breath, wheezing, palpitations, leg swelling, joint pain, dizziness, or depression; but she did report chest pain. (Tr. 1209). Her physical examination was normal. (Tr. 1210). In May 2019, Dr. Huang recorded no new cardiologic or pulmonary symptoms, shortness of breath, significant dyspnea on exertion, or lower extremity swelling. (Tr. 2875). Dr. Huang also noted that plaintiff's mood was stable and Cymbalta was working well. (*Id.*). Plaintiff's physical examination was normal. (Tr. 2878).

### E. Specific Errors

Plaintiff argues that the ALJ's determination that she had the residual functional capacity (RFC) for light work is not supported by substantial evidence. Relatedly, plaintiff argues that the

ALJ erred in finding that she could work full time.  Plaintiff next argues that the ALJ erred by not explaining her rejection of evidence favorable to plaintiff.  Plaintiff also argues that the ALJ erred in failing to find that her mental impairments and incontinence were severe impairments. Finally, plaintiff argues that the ALJ erred by failing to consider a closed period of benefits.

1.  RFC for light work

Plaintiff argues that records from the Cleveland Clinic demonstrate that her congestive heart failure rating of NYHA Class II and Stage C precluded light work.  Plaintiff also points to an exercise oximetry test as demonstrating that she was not capable of sustaining light work.[7] Plaintiff next argues that the facts of her knee and back surgeries are incompatible with the exertional requirements of light work.  Relatedly, plaintiff argues that clinical findings of swelling, weakness, loss of sensation, and wheezing, as well as having received a handicap placard, are inconsistent with the exertional requirements of light work.  Finally, plaintiff argues that the state agency reviewing physicians, upon whom the ALJ relied, did not examine her or have more recent medical records supporting her claims.

The Commissioner responds that the state agency reviewing physicians' opinions were the only medical opinions of record, and the ALJ's decision reflects due consideration of records that post-dated their review.  The Commissioner also points to various medical records demonstrating that plaintiff's medical impairments related to congestive heart failure were not as serious as alleged by plaintiff, her asthma was controlled, and her pulmonary function was

---

[7] Plaintiff refers to this test being in the record at Tr. 2306-2489.  (Doc. 16 at PAGEID 3632).  This part of the record, however, contains Bethesda North hospital treatment records between September 22 and November 16, 2017.  The test plaintiff refers to appears to have been performed on March 24, 2017, at Good Samaritan hospital. (Tr. 626).

13

adequate. As related to plaintiff's knee and back issues, the Commissioner points to her reported exercise, low pain levels, and recent work experience as demonstrating a lack of associated functional limitation.

The ALJ's decision that plaintiff could perform light work is supported by substantial evidence. A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).[8] A claimant's RFC assessment must be based on all the relevant evidence in his case file. (*Id.*) The governing regulations[9] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)-(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. § 404.1520c(a).

The ALJ relied on the state agency reviewing physicians' opinions (Gerald Klyop, M.D., and Diane Manos, M.D.). (Tr. 22). They reviewed plaintiff's record in March and June 2018, respectively, and both found that plaintiff could perform work at the light exertional level with postural and environmental limitations. (Tr. 80-82, 107-09). The ALJ found their assessments

---

[8] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical . . . and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively." *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n.1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)). The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations for purposes of this Order.
[9] Plaintiff's applications were filed after March 27, 2017. Therefore, they are governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c.

14

"persuasive in that they are supported with an explanation that is consistent with the objective evidence of record." (Tr. 22). Plaintiff argues that the ALJ's reliance on these opinions was misplaced because Drs. Klyop and Manos did not examine plaintiff or have an opportunity to review all of the pertinent medical evidence.

An ALJ is not prohibited from finding a non-examining source more persuasive than an examining source. *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012). But where relevant medical evidence of record post-dates the state agency physicians' review, the ALJ must provide "some indication" that she considered that evidence in conjunction with her decision to rely on the state agency physicians' opinions. *Blakley*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

The ALJ's decision indicates that she considered the complete case record. For example, the ALJ considered plaintiff's April 2018 visit to Dr. Estep at the Cleveland Clinic. (Tr. 21, referring to Tr. 1245-53). Dr. Estep, however, did not provide any opinion on plaintiff's functional limitations. The ALJ also acknowledged plaintiff's September 2018 COPD exacerbation. (Tr. 22, referring to Tr. 2974). Plaintiff does not point, however, to any records showing that COPD otherwise resulted in regular following care or functional limitations. Finally, the ALJ acknowledged plaintiff's arthroscopic knee surgery and pain management for low back pain (Tr. 18, 22), but plaintiff does not indicate how these impairments led to a greater loss in functionality than what was found by the state agency reviewing physicians. The ALJ's reliance on the state agency reviewing physicians' opinions is supported by substantial evidence.

Plaintiff next argues that record evidence related to her cardiologic and pulmonary impairments demonstrate that she could not perform light work—pointing to her diagnosis of NYHA Class II and Stage C heart failure and exercise oximetry test. As to heart failure, Dr. Estep did not endorse any functional limitations related to plaintiff, specifically; and the Class II/Stage C designations, generally, do not necessarily equate to an *inability* to engage in work at the light exertional level. (Tr. 1245-63). *See* https://www.mayoclinic.org/diseases-conditions/heart-failure/diagnosis-treatment/drc-20373148 (last visited March 7, 2022) ("Everyday activities *can be done without difficulty* but exertion causes shortness of breath or fatigue.") (emphasis added). As to the exercise oximetry test, although plaintiff did require three rests for shortness of breath during the six-minute/1,015-foot test, her oxygen saturation levels "remained between 97 and 98% throughout the study." (Tr. 626). Moreover, Dr. Hoffmann, who ordered the test, found there was "no indication for oxygen therapy." (Tr. 625). This test does not serve as a basis to ignore other significant medical record evidence showing that plaintiff's pulmonary issues were largely controlled. (*See, e.g.*, Tr. 891, 919, 1194 (records describing plaintiff's asthma as controlled); Tr. 361, 364, 644, 648, 872, 1192, 2792, 2875 (records in which plaintiff denies experiencing shortness of breath)).

Plaintiff also argues that her knee and back impairments are inconsistent with the six hours of standing and/or walking in an eight-hour day contemplated by a light exertional work RFC—pointing to her handicap placard and clinical findings in the record, such as lower extremity swelling, lower extremity weakness, loss of sensation, and wheezing.[10] As an initial

---

[10] Plaintiff does not direct the Court to particular records documenting these findings. (*See* Doc. 16 at PAGEID 3630).

matter, a handicap placard is not dispositive of the disability determination, and plaintiff does not attempt to explain why its issuance would be particularly relevant to the ALJ's determination in this case. *See Ceo v. Comm'r of Soc. Sec.*, No. 1:19-cv-934, 2020 WL 6542029, at *5 (S.D. Ohio Nov. 7, 2020) ("Plaintiff has not shown how the handicap placard prescribed . . . supports the preclusion of sedentary work during the relevant time period."), *report and recommendation adopted*, 2021 WL 1087389 (S.D. Ohio Mar. 22, 2021); 20 C.F.R. § 404.1504 ("Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us. . . .").

Plaintiff's generic references to clinical findings associated with her knee and back impairments are also unavailing. Plaintiff argues, simply, that these notations in the record "militate against the ability to handle the standing and walking rigors required by light work." (Doc. 16 at PAGEID 3630). The ALJ noted plaintiff's knee surgery (Tr. 18) and summarized plaintiff's chronic low back pain and related clinical findings and treatments. (Tr. 22). There are numerous other treatment records, however, consistent with a light-work RFC. (*See, e.g.*, Tr. 2517 (June 2017 record showing that plaintiff was walking, jogging, and lifting weights); Tr. 1024 (April 2018 record, post-car accident, showing that plaintiff's pain was 2/10 and relieved with medication); Tr. 1275, 1280, 1343, 1347 (August 2018 and January 2019 records reflecting ice and physical therapy as effective treatments and normal gait). The ALJ specifically noted a January 2019 physical therapy record in which plaintiff reported that her knee was "mostly pain[]free[.]" (Tr. 21, referring to Tr. 2842). The same record reflects that plaintiff was lifting

17

15-pound free weights, walking on a treadmill for 30 minutes, going up and down stairs without using a railing, and interested in aquatic therapy. (Tr. 2841). Finally, the ALJ noted that plaintiff continues to work part time as an aide/companion to elderly clients, only missing work and leaving work early twice between February and October 2019 due to symptoms of her impairments. (Tr. 18, referring to testimony at Tr. 39, 60). The ALJ was entitled to consider this work—which includes walking with clients, changing their clothes, helping them in the restroom, and helping them shower (Tr. 60)—in making her RFC determination. *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) ("[T]he ALJ did not err by considering [plaintiff's] ability to maintain part-time employment as one factor relevant to the determination of whether he was disabled.").

The ALJ considered the entire record in making her light work RFC determination, and her evaluation of the state agency physicians' opinions was based on substantial evidence. 20 C.F.R. §§ 404.1545(a)(1); 404.1546. Plaintiff's first assignment of error is overruled.

2. RFC for full-time work

Plaintiff next argues that she is not able to sustain full-time employment because the VE testified that more than one absence per month was work-prohibitive. Plaintiff relies on a chart that her counsel prepared at the administrative level (Tr. 294) and included in her brief before this Court (Doc. 16 at PAGEID 3631), which quantifies her missed work due to doctor appointments, medical tests, hospitalizations, emergency department visits, and therapy appointments between May 2016 and September 2019. Plaintiff argues that the chart reflects

18

that she would have missed two days of work or more in 28 of the 41 months included in the chart (more than 2/3) before considering absences related to symptoms alone.

Plaintiff's argument is not well-taken.  A forward-looking schedule of medical appointments is not sufficient to demonstrate disability.  *Cf. Beck v. Comm'r of Soc. Sec.*, No. 4:19-cv-2320, 2020 WL 5417536, at *4 (N.D. Ohio Sept. 10, 2020) ("Plaintiff has pointed to no case law in support of her proposition that her schedule of appointments (even if it were in the record) would be sufficient by itself to establish a disability, and the Court's own independent research has found none."); *Swafford v. Comm'r of Soc. Sec.*, No. 1:12-cv-19, 2013 WL 1196590, at *1 (S.D. Ohio Mar. 25, 2013) ("[E]vidence of frequent medical appointments alone is not enough [to establish the inability to sustain work].  Instead, there must be evidence such as a medical source opinion about the likelihood of absenteeism caused by the claimant's impairments and the need for treatment during working hours.").  A backward-looking record of appointments, as provided here, without a medical source opinion explaining the need for treatment during work hours, is no more useful in determining a plaintiff's RFC.

The ALJ's finding that plaintiff is capable of full-time work is based on substantial evidence.  This assignment of error is overruled.

> 3. The ALJ's alleged failure to address records that supported plaintiff's claims

Plaintiff next argues that the ALJ's decision does not reflect that she reviewed the record as a whole.  In particular, she argues that "the ALJ failed to acknowledge and explain" the following "probative" evidence: (1) a Cleveland Clinic record showing plaintiff's NYHA Class II and Stage C heart failure classification, (2) plaintiff's oximetry test results, (3) plaintiff's

handicap placard, (4) the medical treatment chart prepared by plaintiff's counsel, and (5) urinary incontinence records.  The Commissioner responds that the ALJ was not required to address every piece of potentially conflicting evidence so long as her factual findings demonstrate that the ALJ resolved such conflicts.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).  Moreover, the Commissioner argues that, even if the ALJ did not consider this evidence, plaintiff has not demonstrated how she was prejudiced by such failure.  *See Rabbers*, 582 F.3d at 654.

The Court has already addressed why the evidence numbered (1)-(4) above does not compel a different result in plaintiff's case.  Nor do the records regarding plaintiff's incontinence persuade the Court that the ALJ committed reversible error.  Plaintiff cites to broad swaths of treatment records in support of her contention regarding incontinence without identifying the relevant portions thereof.  (*See* Doc 16 at PAGEID 3632, referring to Tr. 801-999, 1015-34, 2864-95 (Group Health records); Tr. 2249-2305 (TriHealth Orthopedics and Sports records)).  Plaintiff argues that her symptoms of urinary incontinence "indisputably favor[] [p]laintiff's claim of disability" and "could cause non-exertional occupational restrictions. . . ."  (Doc. 16 at PAGEID 3632-33).  The Commissioner argues in response that plaintiff does not explain why such records would have supported a finding of disability, and in any event, the relevant records show no more than minimal impairment.

The ALJ's RFC determination is supported by substantial evidence even where she did not expressly address plaintiff's incontinence.  The mere diagnosis of a condition says nothing about whether such condition functionally limits a claimant.  *Cf. Higgs v. Bowen*, 880 F.2d 860,

863 (6th Cir. 1988) ("The mere diagnosis of [a condition] . . . says nothing about the severity of the condition."). The medical evidence in the record concerning incontinence does not support the notion that it was a disabling condition. (*See, e.g.*, Tr. 752-56, Tr. 773-76, Tr. 877-83, Tr. 888-92, Tr. 897-901, Tr. 1019-23, Tr. 1211, Tr. 2875-79 (primary care records between 2016 and 2019 in which incontinence is not referenced)). Drs. Das and Klyop did not opine on this impairment (*see* Tr. 80-82, 106-109), leaving plaintiff's testimony as the only potential evidence regarding its functional impact (*see* Tr. 58-59). Plaintiff testified that she uses Depends to manage accidents, but she did not otherwise explain how this impairment prevented her from performing light work. (Tr. 58). Plaintiff also does not identify related functional limitations in her brief. This assignment of error is overruled.

### 4. ALJ's alleged failure to identify severe impairments

Plaintiff argues that the ALJ failed in her decision to identify her mental impairments and incontinence as severe impairments. The Commissioner argues in response that substantial evidence shows that these impairments resulted in only minimal limitations on plaintiff's functional abilities.

The regulations define a "severe" impairment or combination of impairments as one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions and the mental abilities to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1522(b). An impairment is considered "severe" unless "the [claimant's] impairment(s) has no more than a

minimal effect on his or her physical or mental ability(ies) to perform basic work activities."
SSR 85-28,[11] 1985 WL 56856, at *3. "The mere diagnosis of an impairment does not indicate
the severity of the condition nor the limitations, if any, that it imposes." *Stevenson v. Astrue*, No.
3:10-cv-442, 2011 WL 7561883, at *5 (S.D. Ohio Aug. 1, 2011) (citation omitted), *report and
recommendation adopted*, 2012 WL 936754 (S.D. Ohio Mar. 20, 2012).

The claimant's burden of establishing a "severe" impairment at step two is "*de minimis*."
*Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 325 (6th Cir. 2015) (citing *Higgs*, 880 F.2d at
862). "[A]n impairment can be considered not severe only if it is a slight abnormality that
minimally affects work ability regardless of age, education, and experience." *Id.* (quoting *Higgs*,
880 F.2d at 862).

Once "an ALJ determines that one or more impairments is severe, the ALJ must consider
limitations and restrictions imposed by all of an individual's impairments, even those that are not
severe." *Singleton v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 1028, 1033 (S.D. Ohio 2015)
(internal quotation marks omitted) (quoting *Fisk*, 253 F. App'x at 583 (citing SSR 96-8p, 1996
WL 374184, at *5 (July 2, 1996))). Where the ALJ finds at least one severe impairment, the
ALJ's failure to find additional severe impairments at step two is not reversible error where the
ALJ considers the claimant's impairments—both severe and non-severe—in the remaining steps
of the disability determination. *Maziarz v. Sec'y of H.H.S.*, 837 F.2d 240, 244 (6th Cir. 1987);
*see also Fisk*, 253 F. App'x at 583-84. "So long as the ALJ finds at least one severe impairment

---

[11] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social
Security Administration' and represent 'precedent final opinions and orders and statements of policy and
interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir.
2010) (quoting 20 C.F.R. § 402.35(b)(1)).

and analyzes all impairments in the following steps, the characterization of other impairments as severe or non-severe is 'legally irrelevant.'" *Deaner v. Comm'r. of Soc. Sec.*, 840 F. App'x 813, 817 (6th Cir. 2020) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). This rule acknowledges that an ALJ "properly could consider claimant's [non-severe impairments] in determining whether claimant retained sufficient residual functional capacity to allow [her] to perform substantial gainful activity." *Winn*, 615 F. App'x at 326 (quoting *Maziarz*, 837 F.2d at 244).

The ALJ did not mention plaintiff's urinary incontinence in her decision, but she identified other severe impairments and proceeded with the sequential evaluation. (Tr. 18). The ALJ also specifically discussed two records that identified urinary incontinence as an issue. (*See* Tr. 22, referring to Tr. 749 (December 2017 record from Dr. Huang recording "[p]ersistent [history] of urinary incontinence"), Tr. 1275 (August 2018 pain management record reflecting plaintiff's report of "bladder incontinence")). Any error in the ALJ's failure to specifically discuss plaintiff's incontinence is therefore harmless. *See Maziarz*, 837 F.2d at 244. Moreover, as discussed above, plaintiff presents this diagnosis but does not point to actual related functional limitations. *See Higgs*, 880 F.2d at 863. As it relates to incontinence, plaintiff's assignment of error is overruled.

The ALJ addressed plaintiff's mental health impairments at step two of the sequential analysis as follows:

> [Plaintiff]'s medically determinable mental impairments of depression and anxiety, when considered singly and in combination, do not cause more than minimal limitation in her ability to perform basic mental work activities and are therefore non-severe. Per [plaintiff]'s own testimony, until recently she did not

23

> acknowledge symptoms of depression or anxiety.  In May 2019, she reported doing well with Cymbalta for depression and anxiety with no side effects.  Other than for some breakthrough symptoms, her moods remained stable (Exhibits 22F/26, 20, 26F).

(Tr. 18).  In discussing the four broad mental functioning areas, or Paragraph B criteria, 20 C.F.R.

Pt. 404, Subpt. P, App. 1, §§ 12.00(E)(1)-(E)(4), 12.04(B), 12.06(B), the ALJ found:

> The first functional area is understanding, remembering or applying information.  In this area, [plaintiff] has mild limitation.  [Plaintiff] reports anxiety related to financial limitations and limited sleep (Exhibit 26F/1).

> The next functional area is interacting with others.  In this area, [plaintiff] has mild limitation.  [Plaintiff] reports she tends to disconnect from others and be alone (26F/1).  However, she engages with elderly clients through her current part-time work.

> The third functional area is concentrating, persisting or maintaining pace.  In this area, [plaintiff] has mild limitation.  She testified to crying and becoming overwhelmed (hearing).

> The fourth functional area is adapting or managing oneself.  In this area, [plaintiff] has mild limitation.  She endorsed mood swings and diminished interest in almost all activities during an intake evaluation in November 2018 (Exhibit 26F).  However, she independently takes care of her personal needs and has reported a good response to psychotropic medications ((Exhibits 22F/26, 20, 26F).

> Because [plaintiff]'s medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the [plaintiff]'s ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(Tr. 19).

The ALJ's finding that plaintiff's mental impairments were not severe is supported by substantial evidence.  The plaintiff's argument to the contrary is limited to the following:

24

> [T]he record indicated that plaintiff's hospital admission in May of 2016 may have been related to a conversion disorder; that she was frequently diagnosed with chronic pain syndrome, a diagnosis that carries a psychological component; that she treated with [Group Health] for anxiety and depression (Tr. 2864-2895); and that in 2018, she was examined at NYAP with complaints of daily depression, mood swings, anger outbursts, feelings of worthlessness, in ability to have pleasure was determined to have "serious" psychological illness manifested by a GAF rating of 38 (Tr. 3377-3389).

(Doc. 16 at PAGEID 3633). None of these observations, even if supported by the records cited, demonstrated that the ALJ's decision on this point was not supported by substantial evidence. The ALJ discussed evidence in the record regarding the severity of plaintiff's mental impairment (*see* Tr. 18, referring to Tr. 2875 (May 2019 record reflecting anxiety and depression as stable and controlled with medication)) and whether such evidence was consistent with all of the evidence of record (*see, e.g.*, Tr. 19 referring to Tr. 57, 60, 2883, 3377 (noting plaintiff's reports of interpersonal and mood issues but contrasting them with plaintiff's part-time work as an aide to the elderly, ability to care for herself, and good response to medication)). The ALJ's findings related to plaintiff's mental impairments and their impact on her functioning are supported by substantial evidence. Moreover, even if plaintiff's mental impairments should have been considered severe, this is harmless error. *See Maziarz*, 837 F.2d 240, 244 (6th Cir. 1987). This assignment of error is also overruled as to plaintiff's mental health impairments.

### 5. Closed period of disability

In her last assignment of error, plaintiff asserts that the ALJ failed to consider a closed period of disability. Plaintiff argues that between May 2016 and June 2018, she required two

hospital admissions, four emergency room visits, placement of a loop recorder,[12] multiple ESIs

and fusion surgery for lumbar impairments, and left knee surgery.  The Commissioner responds

that plaintiff failed to make a reasoned argument or provide case law in support of this

assignment of error, and it should therefore be deemed waived.  Regardless, the Commissioner

argues that substantial evidence supports the ALJ's decision that plaintiff had the RFC to

perform light work during the entire period under review.

A claimant no longer qualifying as disabled may be entitled to benefits if she

previously suffered a disability for a continuing, twelve-month period.  *See Kennedy v.*

*Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003); *Smith v. Sec'y of H.H.S.*, 893

F.2d 106, 110 (6th Cir. 1989).  Plaintiff, however, has waived this assignment of error by

failing to adequately present it.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x. 452, 454 (6th

Cir. 2006) (a plaintiff's failure to develop an argument challenging an ALJ's non-disability

determination amounts to a waiver of that argument).  *See also McPherson v. Kelsey*, 125 F.3d

989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by

some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to

mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its

bones.").  Even if it were not waived, as discussed above, plaintiff has failed to identify record

---

[12] Both state agency reviewer Dr. Manos (Tr. 109) and plaintiff (Doc. 16 at PAGEID 3624, 3633) mistakenly refer to this as a pacemaker, which is "a small device that's placed (implanted) in the chest to help control the heartbeat." *See* https://www.mayoclinic.org/tests-procedures/pacemaker/about/pac-20384689 (last visited March 7, 2022). Plaintiff, however, was implanted with a loop recorder (*see* Tr. 644), which "is a type of heart-monitoring device that records your heart rhythm continuously for up to three years."  *See* https://www.mayoclinic.org/tests-procedures/implantable-loop-recorder/pyc-20384986 (last visited March 7, 2022).

evidence demonstrating functional limitations that are the result of her impairments.  This assignment of error is overruled.

### III.  Conclusion

Based on the foregoing, plaintiff's Statement of Errors (Doc. 16) is **OVERRULED**, and the Commissioner's non-disability finding is **AFFIRMED**.  **IT IS THEREFORE ORDERED** that judgment be entered in favor of the Commissioner and this case is closed on the docket of the Court.

Date:   3/7/2022

Karen L. Litkovitz
Chief United States Magistrate Judge